**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SPECIAL SITUATIONS FUND III QP, L.P. SPECIAL SITUATIONS CAYMAN FUND, L.P., AND SPECIAL SITUATIONS PRIVATE EQUITY FUND, L.P., Individually and On Behalf of All Others Similarly Situated, | Case No.: _____ |
| Plaintiffs, | JURY TRIAL DEMANDED |
| v. | |
| CHEMBIO DIAGNOSTICS, INC., RICHARD L. EBERLY, GAIL S. PAGE, ROBERT W. BAIRD & CO. INC., and DOUGHERTY & COMPANY LLC. | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiffs Special Situations Fund III QP, L.P., Special Situations Cayman Fund, L.P., and Special Situations Private Equity Fund, L.P. ("Plaintiffs"), by their undersigned attorneys, allege as follows upon personal knowledge as to their own acts, and upon information and belief as to all other matters, based on the investigation conducted by and through Plaintiffs' counsel, which included, among other things, a review of Chembio Diagnostics, Inc.'s ("Chembio" or the "Company") public filings with the United States Securities and Exchange Commission ("SEC"), press releases issued by the Company, public conference calls, media and news reports about the Company, and publicly available trading data relating to the price and volume of Chembio common stock.

## INTRODUCTION

1.      This is a federal securities class action brought on behalf of two classes:

    A.  all persons who purchased Chembio common stock directly in or traceable to the Company's May 7, 2020 offering (the "May Offering") pursuant to Chembio's Form S-3 Registration Statement and its Prospectus and Prospectus Supplement, dated May 7, 2020 (together, the "Registration Statement").  This class asserts claims only for violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l and 77o (the "Section 11 Class"); and

    B.  all persons who purchased or otherwise acquired Chembio securities on the open market between April 1, 2020 and June 16, 2020, inclusive (the "Section 10(b) Class Period").  This class of investors asserts claims only for violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and 78t(a), and Rule l0b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5, as well as Section 20(a) of the Exchange Act (the "Section 10(b) Class").

2.      The Section 11 Class does not assert any claims sounding in fraud, whether under Section 10(b) of the Exchange Act or otherwise.  Any person who did not purchase Chembio shares directly in the May Offering and pursuant to the Registration Statement, is not included in the Section 11 Class.  The Section 10(b) Class does not assert any claims under Sections 11, 12(a)(2) or 15 of the Securities Act.

3.      Chembio purports to be a leading point-of-care ("POC") diagnostics company focused on detecting and diagnosing infectious diseases.  The Company claims its patented Dual Path Platform ("DPP") technology platform, which uses a small drop of blood from the fingertip, provides high-quality, cost-effective results in approximately 15 minutes.

4.      Furthermore, the Company asserts that its products "meet the highest standards for accuracy and superior performance to help prevent the spread of infectious diseases" and that its "innovative solutions, like the Chembio Dual Path Platform (DPP®), make POC testing faster, more accurate, and more cost effective."

5.      In light of the COVID-19 pandemic, the Company announced it was focusing on the development and commercialization of a serological or antibody test.  Chembio's antibody test was one of the first antibody tests authorized by the FDA during the COVID-19 public health emergency.  .)  The Company secured expedited regulatory approvals for its DPP antibody test from the U.S. Food and Drug Administration (a so-called "Emergency Use Authorization" or "EUA"), along with other countries' regulators.

6.      Throughout the Section 10(b) Class Period, the Company represented that its DPP COVID-19 serological POC test for the detection of IgM and IgG antibodies aided in determining current or past exposure to the COVID-19 virus, that its test provides high sensitivity and specificity, and was 100% accurate.  Test sensitivity is the ability of a test to correctly identify those with the disease (true positive rate), whereas test specificity is the ability of the test to correctly identify those without the disease (true negative rate).

7.      Based on these representations, the Company's stock increased from a closing price on March 31, 2020, the day before the Section 10(b) Class Period begins, of $5.12 per share, to a Class Period high of $15.54 per share on April 24, 2020.

8.      Defendants took advantage of Chembio's inflated stock price.  On May 11, 2020, the Company reported that it closed the May Offering of approximately 2.6 million shares of Chembio stock at $11.75 per share for gross proceeds of approximately $30.8 million.  In the Registration Statement for that May Offering, Chembio again represented that its DPP COVID-19 serological POC test for the detection of IgM and IgG antibodies aided in determining current or past exposure to the COVID-19 virus, that its test provides high sensitivity and specificity, and was 100% accurate.

9.     Then, on June 16, 2020, after the market closed, the U.S. Food and Drug Administration ("FDA") issued a press release disclosing that it had revoked the Company's Emergency Use Authorization ("EUA") for the Company's DPP COVID-19 IgM/IgG System.

> Today, the U.S. Food and Drug Administration revoked the emergency use authorization (EUA) of the Chembio Diagnostic System, Inc. (Chembio) DPP COVID-19 IgM/IgG System, a SARS-CoV-2 antibody test, **due to performance concerns with the accuracy of the test**.  Antibody tests, a type of serological test, can help provide information on a person's and population's exposure to COVID- 19.
>
> Since the beginning of the COVID-19 public health emergency, the FDA has balanced the urgent need for access to diagnostic and antibody tests with providing a level of oversight that helps to ensure accurate tests are being deployed," said Jeff Shuren, M.D., director of FDA's Center for Devices and Radiological Health.  "By continuing to monitor authorized tests and emerging scientific evidence, we are able to make changes when appropriate – **including taking action when a test's benefits no longer outweigh its risks.**  Through these efforts, we are able to help assure that FDA-authorized tests meet the needs of the American public."
>
> The Chembio antibody test was one of the first antibody tests authorized by the FDA during the COVID-19 public health emergency.  At the time of authorization, based on the information that Chembio submitted to the FDA at  that time, the agency concluded that the test met the statute's "may be effective" standard for emergency use authorization, and that the test's known and potential benefits outweighed its known and potential risks.
>
> As the FDA has learned more regarding the capability for performance of SARS- CoV-2 serology tests during the pandemic, and what performance is necessary for users to make well-informed decisions—through both the continued review and authorization of serology tests as well as through a research partnership with the National Institutes of Health's National Cancer Institute (NCI)— the FDA was able to develop general performance expectations for these tests, which are listed in our serology templates.
>
> **Data submitted by Chembio as well as an independent evaluation of the Chembio test at NCI showed that this test generates a higher than expected rate of false results and higher than that reflected in the authorized labeling for the device. Under the current circumstances of the public health**

> **emergency, it is not reasonable to believe that the test may be effective in detecting antibodies against SARS-CoV-2 or that the known and potential benefits of the test outweigh the known and potential risks of the test, including the high rate of false results.** Moreover, the risk to public health from the false test results makes EUA revocation appropriate to protect the public health or safety. As such, the FDA decided to revoke the emergency use authorization of the Chembio test, and this test may not be distributed.

(Emphasis added).

10.     On June 17, 2020, the Company filed a report with the SEC on Form 8-K that acknowledged receipt of the FDA's June 16, 2020 letter and stated, in part, the following:

> On June 16, 2020, we received a letter from the U.S. Food and Drug Administration, or FDA, notifying us that the FDA was revoking the Emergency Use Authorization, or EUA, granted in April 2020 with respect to our DPP COVID-19 System, which consists of our serological test for COVID-19 and one of our Micro Reader analyzers. As a result of this decision by the FDA, we may no longer distribute the DPP COVID-19 System. . .

> In its letter of June 16, 2020, the FDA stated that it had decided to revoke the EUA for the DPP COVID-19 System due to performance concerns regarding the sensitivity and specificity of our test system. . . .

> We intend to continue working with the FDA with respect to the modification of the DPP COVID-19 System and of the revocation of the EUA for our test system.

11.     As a result of disclosure of the FDA letter, Chembio shares declined from a closing price on June 16, 2020 of $9.93 per share to close at $3.89 per share on June 17, 2020, a decline of $6.04 per share, or over 60%, on heavier than usual volume of over 25 million shares.

12.     Also on June 17, 2020, Bloomberg published a report titled "FDA Reversal on Chembio Antibody Test Sends Stock Down 63%" that noted that, in light of the FDA revocation of the Company's EUA, five analysts downgraded Chembio stock.

13.     As a result of Defendants' false and misleading statements of fact and omissions of material facts, other wrongful acts and omissions as alleged herein, and the precipitous decline in the market value of the Company's common stock, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

14.     The claims asserted by the Section 11 Class arise under Sections, 11, 12(a)(2), and 15 of the Securities Act.

15.     The claims asserted by the Section 10(b) Class arise under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

17.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b), as many of the acts and practices complained of herein occurred in substantial part in this District and the Company is currently headquartered in this District.

18.     In connection with the acts alleged herein, Defendants, directly or indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## THE PARTIES

19.     Plaintiffs Special Situations Fund III QP, L.P., Special Situations Cayman Fund, L.P., and Special Situations Private Equity Fund, L.P., as set forth in the accompanying Certification incorporated by reference herein, purchased Chembio common stock (i) in the May 2020 Offering and (ii) during the Section 10(b) Class Period, and have been damaged thereby.

20.     Defendant Chembio is incorporated in Nevada and its principal executive offices are located at 555 Wireless Boulevard, Hauppauge, New York 11788.

21.     Defendant Richard L. Eberly ("Eberly") has been the Company's President and Chief Executive Officer, and a director since March 16, 2020.

22.     Defendant Gail S. Page ("Page"), has been the executive chair of the Company's board of directors since July 2017.

23.     Defendants Eberly and Page are referred to herein as the "Individual Defendants."

24.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Chembio's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.

25.     Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them but not to the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

26.     Chembio and the Individual Defendants are referred to collectively as the "Chembio Defendants."

27.     Defendant Robert W. Baird & Co. Inc. ("Baird") is a diversified financial services firm that, among other things, offers investment banking services to public issuers of securities. Its headquarters are located at 777 East Wisconsin Avenue, Milwaukee, WI, 53202.

28.     Dougherty & Company LLC ("Dougherty," and together with Baird, the "Underwriter Defendants") is a diversified financial services firm that, among other things, offers investment banking services to public issuers of securities.  Its headquarters are located at 90 South Seventh Street, Suite 4300, Minneapolis, MN 55402

29.     The Underwriter Defendants acted as underwriters of, and as sellers in, the May Offering.

## THE SECTION 11 CLASS CLAIMS

### A.     Class Allegations by the Section 11 Class

30.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of all persons who purchased Chembio common stock directly in or traceable to the May Offering pursuant to the Registration Statement.  This class asserts claims only for violations of Sections 11, 12(a)(1) and 15 of the Securities Act.  The Section 11 Class does not assert any claims sounding in fraud, whether under Section 10(b) of the Exchange Act or otherwise.  Any person who did not acquire their Chembio shares directly in or traceable to the May Offering and pursuant to the Registration Statement is not included in the Section 11 Class.

31.     Also excluded from the Section 11 Class are Defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

32.     The members of the Section 11 Class are so numerous that joinder of all members is impracticable.  While the exact number of Section 11 Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are, at least, hundreds of members in the proposed Section 11 Class.  Record owners and other

members of the Section 11 Class may be identified from records maintained by Chembio or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

33.     Plaintiffs' claims are typical of the claims of the members of the Section 11 Class, because all members of the Section 11 Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

34.     Plaintiffs will fairly and adequately protect the interests of the members of the Section 11 Class and have retained counsel competent and experienced in class and securities litigation.

35.     Common questions of law and fact exist as to all members of the Section 11 Class and predominate over any questions solely affecting individual members of the Section 11 Class. Among the questions of law and fact common to the Section 11 Class are:

a)  whether the federal securities laws were violated by Defendants' acts as alleged herein;

b)  whether statements made by Defendants to the investing public in the Registration Statement misrepresented material facts; and

c)  the proper measure of damages.

36.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Section 11 Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Section 11 Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**B.     Substantive Allegations Under the Securities Act**

37.     On May 7, 2020, Chembio filed the Registration Statement with the SEC, announcing a public offering of its common stock.   Thereafter, Defendants, including the Underwriter Defendants, offered and sold approximately 2,619,593 shares of Chembio common stock, which included 281,125 shares issued pursuant to the partial exercise by the underwriters of their option to purchase additional shares, at a public offering price of $11.75 per share for gross proceeds of approximately $30.8 million.

38.     The Registration Statement contained materially untrue statements when made. Among other materially untrue statements, Defendants represented that Chembio's DPP COVID-19 serological POC test for the detection of IgM and IgG antibodies aided in determining current or past exposure to the COVID-19 virus, that its test provides high sensitivity and specificity, and was 100% accurate.

39.     The Registration Statement also failed to disclose that the Company had been made aware prior to its effective date that its DPP Covid-19 antibody test was less reliable than previously touted, and indeed was not sufficiently reliable for the FDA to maintain emergency use authorization status and thus the test's use would soon be discontinued.

40.     The statements referenced above in paragraphs 38-39 were materially false and/or misleading because Defendants misrepresented and failed to disclose that the Company's DPP COVID-19 test did not provide high-quality results and there were material performance concerns with the accuracy of the Company's DPP COVID-19 test.

41.     In truth, as set forth in the FDA's June 16, 2020 letter to the Company, the Company's DPP COVID-19 test generates a higher than expected rate of false results and higher than that reflected in the authorized labeling for the device, and was not effective in detecting

antibodies against SARS-CoV-2.  Indeed, the FDA determined that based on the data the Company submitted in support of its EUA, it was not reasonable to believe that the test may be effective in detecting antibodies against SARS-CoV-2 and that, as a result, there was a material risk to public health from the false test results.

### C.     The Truth Emerges

42.     On June 16, 2020, after the market closed, the FDA issued a press release disclosing that it had revoked the Company's EUA for the Company's DPP COVID-19 Igm/IgG System.

43.     As a result of disclosure of the FDA letter, Chembio shares declined from a closing price on June 16, 2020 $9.93 per share to close at $3.89 per share on June 17, 2020, a decline of $6.04 per share, or over 60%, on heavier than usual volume of over 25 million shares.

### D.     Claims for Relief

### FIRST CLAIM FOR RELIEF

### (Against all Defendants)
### Violations of Section 11 of the Securities Act

44.     Plaintiffs incorporate ¶¶ 1-43 as though fully set forth herein.

45.     Plaintiffs bring this claim pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of themselves and the other members of the Section 11 Class against all Defendants.

46.     With respect to this claim, Plaintiffs exclude allegations that could be construed as alleging fraud or fraudulent conduct and/or motive.  For purposes of asserting this claim under the Securities Act, Plaintiffs do not allege that the Defendants acted with *scienter* or fraudulent intent.

47.     The Registration Statement contained untrue statements of material fact and omitted other facts necessary to make the statements not untrue, and failed to disclose material facts as described above.  Chembio was the Registrant, while the Individual Defendants were

responsible for the contents and dissemination of the Registration Statement, and each signed and/or authorized the signing of the Registration Statement.  Indeed, Defendant Page was a signatory to the S-3 Registration Statement and Defendant Eberly was a board member and CEO at the time of the filing of the relevant Prospectus Supplement.  The Underwriting Defendants served as underwriters for the May Offering.  As such, said Defendants issued, caused to be issued, and participated in the issuance of the Registration Statement and are subject to liability for violations of Section 11 of the Securities Act.

48.     Chembio is absolutely liable to members of the Section 11 Class, who purchased shares pursuant to the Registration Statement, which contained misstatements and omissions.  The Individual Defendants, and the Underwriter Defendants are strictly liable to the members of that Class.  None of the Individual Defendants or the Underwriter Defendants made a reasonable investigation or possessed reasonable grounds to believe that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

49.     By reason of the conduct alleged herein, the Defendants each violated Section 11 of the Securities Act.

50.     Plaintiffs and other members of the Section 11 Class have sustained damages.  The value of Chembio's common stock sold in the May Offering has declined substantially subsequent to, and in response to, Defendants' violations of the Securities Act.  By reason of the foregoing, Defendants are liable to Plaintiffs and the other members of the Section 11 Class for violating Section 11 of the Securities Act.

51.     Plaintiffs have brought the present action promptly after the untrue statements contained in the Registration Statement were discovered or reasonably could have been discovered

and within one year from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Plaintiffs filed this complaint. Likewise, less than three years have elapsed from the time that the securities upon which this cause of action is brought were offered to the public and the time that Plaintiffs filed this complaint.

## SECOND CLAIM FOR RELIEF

### (Against the Individual Defendants)
### For Violations of Section 15 of the Securities Act

52.     Plaintiffs incorporate ¶¶ 1-51 as though fully set forth herein.

53.     Plaintiffs bring this claim pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of themselves and the other members of the Section 11 Class against the Individual Defendants.

54.     With respect to this claim, Plaintiffs exclude allegations that could be construed as alleging fraud or fraudulent conduct and/or motive.  For purposes of asserting this claim under the Securities Act, Plaintiffs do not allege that the Individual Defendants acted with *scienter* or fraudulent intent.

55.     By reason of the wrongful conduct described herein, Chembio committed a primary violation of Section 11 of the Securities Act.

56.     At all relevant times, the Individual Defendants were controlling persons of the Company within the meaning of Section 15 of the Securities Act.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the Registration Statement which

Plaintiffs contend are false and misleading.  By reason of the aforementioned conduct, the Individual Defendants are liable under Section 15 of the Securities Act, jointly and severally with, and to the same extent as, the Company to Plaintiffs and the other members of the Section 11 Class.

57.     Each of the Individual Defendants was a culpable participant in the violations of Section 11 of the Securities Act alleged in the preceding cause of action based on his or her having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the May Offering to be successfully completed.

### THIRD CLAIM FOR RELIEF

**(Against all Defendants)**
**For Violations of Section 12(a)(2) of the Securities Act**

58.     Plaintiffs incorporate ¶¶ 1-43 as though fully set forth herein.

59.     Plaintiffs bring this claim pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), on behalf of themselves and other members of the Section 11 Class against all Defendants.

60.     With respect to this claim, Plaintiffs exclude allegations that could be construed as alleging fraud or fraudulent conduct and/or motive.  For purposes of asserting this claim under the Securities Act, Plaintiffs do not allege that the Defendants acted with *scienter* or fraudulent intent.

61.     The May Offering closed on or around May 11, 2020 with the sale of approximately 2.6 million shares of Chembio stock at $11.75 per share for gross proceeds of approximately $30.8 million.

62.     The Defendants named in this claim were statutory sellers who sold and assisted in the sale of securities to Plaintiffs and other members of the Section 11 Class by means of the Registration Statement, and they did so for the benefit of Chembio and/or for their own personal

gain.  Each of the Individual Defendants and the Underwriting Defendants against whom this claim is asserted were obligated by law to make a reasonable and diligent investigation of the statements contained in the Registration Statement and failed to do so.  Had these defendants exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

63.     As a result of the conduct alleged herein, Defendants named in this claim violated Section 12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, Plaintiffs and the other members of the Section 11 Class who purchased Chembio common stock directly in the May Offering sustained substantial damages.

64.     Plaintiffs and the other members of the Section 11 Class who hold such securities have the right to rescind and recover the consideration paid for their securities, upon tender of their securities to the defendants sued herein. Section 11 Class members who have sold their securities seek damages to the extent permitted by law.

65.     At the time of acquisition of the securities, Plaintiffs and the other members of the Section 11 Class were not aware of the untrue or misleading nature of the statements and/or the omissions alleged herein and could not have reasonably discovered such untrue statements or omissions before they acquired the securities for which this claim is asserted.  Plaintiffs have brought the present action promptly after the untrue statements contained in the Registration Statement were discovered or reasonably could have been discovered and within one year from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Plaintiffs filed this complaint.  Likewise, less than three years have elapsed from the time that the securities upon which this cause of action is brought were offered to the public and the time that Plaintiffs filed this complaint.

## THE SECTION 10(b) CLASS CLAIMS

**A.     Class Allegations by the Section 10(b) Class**

66.     Plaintiffs also bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of all persons who purchased or otherwise acquired Chembio securities on the open market between April 1, 2020 and June 16, 2020, inclusive.  This class of investors asserts claims only for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and 78t(a), and Rule l0b-5 promulgated thereunder, as well as Section 20(a) of the Exchange Act.

67.     Excluded from the Section 10(b) Class are Defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

68.     The members of the Section 10(b) Class are so numerous that joinder of all members is impracticable.  While the exact number of Section 10(b) Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds of members in the proposed Section 10(b) Class.  Record owners and other members of the Section 10(b) Class may be identified from records maintained by Chembio or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

69.     Plaintiffs' claims are typical of the claims of the members of the Section 10(b) Class, as all members of the Section 10(b) Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

70.     Plaintiffs will fairly and adequately protect the interests of the members of the Section 10(b) Class and have retained counsel competent and experienced in class and securities litigation.

71.     Common questions of law and fact exist as to all members of the Section 10(b) Class and predominate over any questions solely affecting individual members of the Section 10(b) Class.  Among the questions of law and fact common to the Section 10(b) Class are:

a)  whether the federal securities laws were violated by Defendants' acts as alleged herein;

b)  whether statements made by Defendants to the investing public in their public statements and filings with the SEC misrepresented material facts; and

c)  to what extent the members of the Section 10(b) Class have sustained damages and the proper measure of those damages.

72.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Section 10(b) Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Section 10(b) Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**B.     False and Misleading Statements in the Section 10(b) Class Period**

73.     On March 31, 2020, after the market closed, the Company issued a press release titled "Chembio Announces Launch of DPP COVID-19 Serological Point-of-Care Test" that stated the following[1]:

IgM/IgG Antibody Results in 15 Minutes from a Simple Finger Stick

---

[1] The statements quoted in this section in ***bold and italicized*** typeface are materially false and misleading for the reasons set forth herein.

HAUPPAUGE, N.Y., March 31, 2020 (GLOBE NEWSWIRE) -- Chembio Diagnostics, Inc. (Nasdaq: CEMI), a leading point-of-care diagnostic company focused on infectious diseases, today announced the U.S. launch of the rapid DPP COVID-19 serological point-of-care test for the detection of IgM and IgG antibodies. These results can be obtained within 15 minutes from a simple finger stick utilizing Chembio's MicroReader 1 and MicroReader 2 analyzers which are produced by Chembio Germany. ***The ability of the DPP platform to provide numerical results can aid clinicians in determining current or past exposure to the COVID-19 virus and monitoring infection progression, while avoiding the human interpretation errors associated with visual readings.***

The DPP COVID-19 test detects antibodies in the blood that are produced by the body in response to a novel coronavirus infection. Numerical readings of the IgM and IgG antibodies have the ability to assist clinicians in determining patients who have been exposed to the novel coronavirus, even among patients who exhibit mild to no symptoms. Detection of an acute infection phase, as determined by the level of IgM antibodies, helps determine if a patient may still be infectious and could possibility transmit the infection to another person. Further along in the infection progression, the body typically starts to produce IgG antibodies, which increase while IgM levels decrease until eventually only IgG antibodies are present, demonstrating prior infection without the ability to transmit the virus.

***"The results and data from our DPP COVID-19 test can help improve clinical outcomes through the management of individual patients by enabling clinicians to understand the likelihood of past and present infection and to manage populations as a whole as a surveillance test,"*** stated Richard Eberly, Chief Executive Officer of Chembio. ***"Our measured approach has positioned us to offer a viable and sustainable long-term solution for clinicians.*** We expect to begin shipping product in April 2020, and we will continue to work with our partner LumiraDx to provide DPP COVID-19 tests with the ability to scale based upon market demand."

"We are excited that, through diligent collaboration with the FDA, our test will be distributed as authorized by the FDA Notification process under the public health emergency guidance issued on March 16, 2020," stated Gail S. Page, Chembio director. "This is another example of Chembio's ability to respond in an expeditious manner to global pandemics with differentiated solutions, as demonstrated previously with Zika and Ebola." . . . .

Chembio is a leading point-of-care diagnostics company focused on detecting and diagnosing infectious diseases. ***The company's patented DPP technology platform, which uses a small drop of blood from the fingertip, provides high-quality, cost-effective results in approximately 15 minutes.***

74.     On April 15, 2020, Chembio issued a press release titled "Chembio Diagnostics Receives Emergency Use Authorization for DPP COVID-19 System for IgG and IgM Antibodies" that stated, as follows:

> First Shipments of the COVID-19 Serological Test have been Released
>
> HAUPPAUGE, N.Y., April 15, 2020 (GLOBE NEWSWIRE) – Chembio Diagnostics, Inc. (Nasdaq: CEMI), a leading point-of-care diagnostic company focused on infectious diseases, today announced receipt of Emergency Use Authorization (EUA) for its DPP COVID-19 System. The DPP COVID-19 System is a serological test and analyzer that provides numerical readings for both IgM and IgG levels within 15 minutes from a simple finger stick drop of blood. Both Chembio's Micro Reader 1 and Micro Reader 2 analyzers are compatible with the test.
>
> "We are very pleased with the continued progress our teams are making to address the market demands with our DPP COVID-19 serological system," stated Rick Eberly, Chembio's Chief Executive Officer. ***"The flexibility of having two analyzers and a system that provides high sensitivity and specificity that is generally consistent with the performance of Chembio's other DPP platform tests as part of our offering places us in a unique position to serve a variety of markets.*** Additionally, we are pleased to announce that our manufacturing team has produced and shipped our first lots of the COVID-19 Systems, and we look forward to providing further product within the US and abroad.

75.     On May 4, 2020, the Company reported its financial results for the quarter ended March 31, 2020 and conducted a conference call with investors in which Defendants Eberly and Page participated.  During the conference call, Defendant Eberly represented that the ***"accuracy of the DPP COVID-19 systems after 11 days post the onset of symptoms is 100% for total***

***antibodies.*** This is based on our data that was submitted to and reviewed by the FDA for the EUA."

76.    On May 11, 2020, the Company issued a press release titled "Chembio Diagnostics Announces Closing of Public Offering of Common Stock" that stated the following:

> HAUPPAUGE, N.Y., May 11, 2020 (GLOBE NEWSWIRE) – Chembio Diagnostics, Inc. (Nasdaq: CEMI) ("Chembio"), a leading point-of-care diagnostic company focused on infectious diseases, announced today the closing of its previously announced public offering of 2,619,593 shares of its common stock, which included 281,125 shares issued pursuant to the partial exercise by the underwriters of their option to purchase additional shares, at a public offering price of $11.75 per share for gross proceeds of approximately $30.8 million.  All shares of common stock sold in the offering were offered by Chembio.

77.    On May 4, 2020, the Company issued a press release reporting the Company's financial results for the quarter ended March 31, 2020, that stated, in part, the following:

> Recent Accomplishments & Highlights
>
> •        Attained FDA Emergency Use Authorization for the DPP COVID-19 IgM/IgG System serological test
> •        Announced the U.S. launch and shipments to customers of the DPP COVID-19 System
> •        Selected by Stony Brook Medicine as the testing solution to identify COVID-19 survivors for study on COVID-19 convalescent plasma therapy
> •        Received a $4.0 million purchase order from Bio-Manguinhos for our DPP COVID-19 System . . . .
>
> During the first quarter, we refocused our business strategy to address the escalating need for COVID-19 diagnostic tests. In a short period of time, we developed a COVID-19 serological testing system, received FDA Emergency Use Authorization and began shipping tests to customers in the United States and Brazil in April. ***Our differentiated testing system offers numerical discrete detection of both IgM and IgG antibodies in approximately 15 minutes from a fingerstick.  Then, in approximately 15 seconds, the DPP COVID-19 System reads the test to provide numerical results using the portable Micro Reader analyzers that are engineered and produced by our wholly owned subsidiary in Germany.  Numerical results reduce the possibility of the types of***

*human error that can be experienced in the visual interpretations required by many other serological tests,"* said Gail Page, Chembio's Executive Chair of the Board.   "We are proud to be serving the needs of clinicians and the broader healthcare community in this time of crisis.

It has been an extremely productive first few weeks in my new role as CEO.  Amid these challenging circumstances, the skill and hard work of this team has enabled a successful strategic pivot as we prioritize manufacturing and commercialization of our DPP COVID-19 System," said Richard Eberly, Chembio's Chief Executive Officer.  "Through efficient use of our resources and technical ability, we are scaling production of these tests due to the strong demand we are experiencing. We believe the features and benefits offered by our DPP COVID-19 System will make it a preferred solution."

78.     On May 18, 2020 the Company issued a press release titled "Chembio Diagnostics Announces US Distribution Agreement to Expand Reach of DPP COVID-19 Serological Test with Thermo Fisher Scientific's Healthcare Channel" that stated the following:

HAUPPAUGE, N.Y., May 18, 2020 (GLOBE NEWSWIRE) – Chembio Diagnostics, Inc. (Nasdaq: CEMI), a leading point-of-care diagnostic company focused on infectious diseases, today announced it has signed a multi-year, non-exclusive agreement with Thermo Fisher Scientific's healthcare channel, to distribute Chembio's DPP COVID-19 System in the United States. *The DPP COVID-19 System is a rapid serological test and analyzer that provides numerical readings for both IgM and IgG antibody levels within 15 minutes from a finger stick drop of blood*. The DPP COVID-19 System can include either Chembio's Micro Reader 1 or Micro Reader 2 analyzer.

"We are pleased to announce our strategic supplier partnership with the Fisher Healthcare channel, which will significantly increase our commercial footprint by providing access to thousands of hospital and physician office moderately complex labs across the country," stated Rick Eberly, Chembio's President and Chief Executive Officer.  "We have initiated a comprehensive training and marketing program for the Fisher Healthcare channel sales team, in order to expand the targeted coverage for this important segment of the market as soon as possible."

79.     The statements referenced above in paragraphs 70-78 were materially false and/or misleading because the Chembio Defendants misrepresented and failed to disclose that the Company's DPP COVID-19 test did not provide high-quality results and there were material performance concerns with the accuracy of the Company's DPP COVID-19 test.  In truth, as set forth in the FDA's June 16, 2020 letter to the Company, the Company's DPP COVID-19 test generates a higher than expected rate of false results and higher than that reflected in the authorized labeling for the device, and was not effective in detecting antibodies against SARS-CoV-2. Indeed, the FDA determined that based on the data the Company submitted in support of its EUA, it was not reasonable to believe that the test may be effective in detecting antibodies against SARS-CoV-2 and that, as a result, there was a material risk to public health from the false test results.

### C.     The Truth Emerges

80.     On June 16, 2020, after the market closed, the FDA issued a press release disclosing that it had revoked the Company's EUA for the Company's DPP COVID-19 Igm/IgG System.

81.     As a result of disclosure of the FDA letter, Chembio shares declined from a closing price on June 16, 2020 $9.93 per share to close at $3.89 per share on June 17, 2020, a decline of $6.04 per share, or over 60%, on heavier than usual volume of over 25 million shares.

### D.     Loss Causation/Economic Loss

82.     During the Section 10(b) Class Period, as detailed herein, the Chembio Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the Chembio stock price and operated as a fraud or deceit on the Section 10(b) Class Period purchasers of Chembio stock by misrepresenting the efficacy of the Company's DPP COVID-19 test.  The Chembio Defendants achieved this by making false statements about Chembio's DPP COVID-19 test, while they knew or at least recklessly disregarded that there were material performance concerns with its DPP COVID-19, as alleged herein.  Later, however, when the Chembio

Denfendants' prior misrepresentations were disclosed and became apparent to the market, the price of Chembio stock fell precipitously as the prior artificial inflation came out of Chembio' stock price.

83.    As a result of their purchases of Chembio stock during the Section 10(b) Class Period, plaintiffs and other members of the Section 10(b) Class suffered economic loss, *i.e.*, damages under the federal securities laws.

84.    As a direct result of the public revelations regarding the truth about the condition of Chembio's business and the negative adverse factors that had been impacting Chembio's business during the Class Period, the price of Chembio's stock materially declined.  This drop removed the inflation from Chembio's stock price, causing real economic loss to investors who purchased the stock during the Section 10(b) Class Period.

85.    The decline in Chembio's stock price at the end of the Class Period was a direct result of the nature and extent of the Chembio Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of Chembio's stock price declines negate any inference that the loss suffered by Plaintiffs and other Section 10(b) Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the defendants' fraudulent conduct.

**E.    Fraud-on-the-Market Doctrine**

86.    At all relevant times, the market for Chembio's common stock was an efficient market for the following reasons, among others:

a)  The Company's common stock met the requirements for public listing and was listed and actively traded on the Nasdaq, a highly efficient market;

b)  As a regulated issuer, the Company filed periodic public reports with the SEC; and

    c)  The Company regularly issued press releases which were carried by national news wires.  Each of these releases was publicly available and entered the public marketplace.

87.    As a result, the market for the Company's publicly traded common stock promptly digested current information with respect to Chembio from all publicly available sources and reflected such information in the price of the Company's common stock.  Under these circumstances, all purchasers of the Company's publicly traded common stock during the Class Period suffered similar injury through their purchase of the publicly traded common stock of Chembio at artificially inflated prices and a presumption of reliance applies.

    **F.**    **Additional Scienter Allegations**

88.    As alleged herein, the Chembio Defendants acted with scienter in that the Chembio Defendants knew that the public documents and statements issues or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

89.    As set forth elsewhere herein in detail, the Chembio Defendants, by virtue of their receipt of information reflecting the true facts regarding Chembio, their control over, and/or receipt and/or modification of Chembio's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Chembio, participated in the fraudulent scheme alleged herein.

90.    The Chembio Defendants knew or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a

substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

91.     The Chembio Defendants had the motive and opportunity to perpetrate the fraudulent scheme and course of business described herein because the Individual Defendants were the most senior officers of Chembio, issued statements and press releases on behalf of Chembio and had the opportunity to commit the fraud alleged herein.  As alleged above, during the Section 10(b) Class Period, the Company closed a public offering of its common stock at an artificially inflated price for approximately $30 million in gross proceeds.

**G.     No Safe Harbor**

92.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

93.     Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, the Chembio Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward looking statement was false, or the forward-looking statement was authorized and/or approved by an executive officer of Chembio who knew that those statements were false when made.

### H.  Claims for Relief

**FOURTH CLAIM FOR RELIEF**

**(Against the Chembio Defendants)**
**For Violation of Section 10(b) of the Exchange Act**
**and Rule 10b-5**

94.     Plaintiffs incorporate by reference ¶¶ 1-29 and 66-93 as though fully set forth herein.

95.     During the Section 10(b) Class Period, the Chembio Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

96.     The Chembio Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

a)      Employed devices, schemes and artifices to defraud;

b)      Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made not misleading; or

c)      Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Chembio publicly traded common stock during the Section 10(b) Class Period.

97.     Plaintiffs and the Section 10(b) Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Chembio's publicly traded common stock.  Plaintiffs and the Section 10(b) Class would not have purchased Chembio common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the Chembio Defendants' misleading statements.

98.     As a direct and proximate result of the Chembo Defendants' wrongful conduct, Plaintiffs and the other members of the Section 10(b) Class suffered damages in connection with their purchases of Chembio common stock during the Section 10(b) Class Period.

99.     Plaintiffs have brought this Fourth Claim for Relief within two years of discovery of the misstatements and wrongful conduct described herein, and in all events no later than five years after such alleged misstatements and wrongful conduct.  Consequently, this action is timely under the Exchange Act.

## FIFTH CLAIM FOR RELIEF

### (Against the Individual Defendants)
### For Violation of Section 20(a) of the Exchange Act

100.    Plaintiffs incorporate by reference ¶¶ 1-29 and 66-93 as though fully set forth herein.

101.    The Individual Defendants acted as controlling persons of Chembio within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and  other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause  the statements to be corrected.

102.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

103.     As set forth above, Chembio and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions each as a controlling person, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Chembio's and the Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Section 10(b) Class Period.

104.     Plaintiffs have brought this Fifth Claim for Relief within two years of discovery of the misstatements and wrongful conduct described herein, and in all events no later than five years after such alleged misstatements and wrongful conduct.  Consequently, this action is timely under the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows: declaring this action to be a proper class action; awarding damages, including interest; awarding reasonable costs, including attorneys' fees; and such equitable/injunctive relief as the Court may deem proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.


DATED:   August 17, 2020                    **LOWENSTEIN SANDLER LLP**

                                By:   ___*/s/ Jennifer A. Randolph*_____
                                        Lawrence M. Rolnick
                                        Marc B. Kramer
                                        Steven M. Hecht
                                        Brandon Fierro
                                        Jennifer A. Randolph
                                        1251 Avenue of the Americas
                                        New York, New York 10020
                                        Tel:      (212) 262-6700
                                        Fax:      (212) 262-7402
                                        lrolnick@lowenstein.com

                                        *Attorneys for Plaintiffs*

## CERTIFICATION PURSUANT TO THE FEDERAL SECURITIES LAWS

I, David Greenhouse, of full age, on behalf of Special Situations Fund III QP, L.P. ("Fund III"), Special Situations Cayman Fund, L.P. ("Cayman Fund"), and Special Situations Private Equity Fund, L.P. ("PE Fund") (collectively the "Funds"), as to the claims asserted by the Funds under the federal securities laws, hereby certify as follows:

1.    The Funds are limited partnerships that are part of a larger family of Special Situations funds having a place of business at 527 Madison Avenue, Suite 2600, New York, NY 10022.  I am an Executive Vice President and shareholder of AWM Investment Company ("AWM"), which is the general partner of MGP Advisors LP, which is the registered investment advisor for the Funds.  I am familiar with the matters set forth herein and am duly authorized to make this Certification on behalf of the Funds.

2.    The Special Situations funds, including the three Funds who seek Lead Plaintiff status in this case, are institutional investors that are commonly managed by myself and others through AWM.  As investment funds, they receive money from a variety of investors, including pension plans, college and university endowments and individuals, and purchase equity securities in public companies, including the stock of companies with small-market and micro-market capitalization.

3.    I have reviewed the complaint prepared by the Funds' attorneys, Lowenstein Sandler LLP, and have authorized Lowenstein to file it on the Funds' behalf.  I have also authorized Lowenstein to file a motion for consolidation of the existing class actions against Chembio Diagnostics, Inc. ("Chembio") and for appointment of the Funds as Lead Plaintiffs and the securities litigation group at Lowenstein Sandler as lead counsel for the two classes identified in the complaint.

4.    The Funds did not purchase Chembio securities at the direction of counsel or in order to participate in any action arising under the federal securities laws.

5.    The Funds are willing to serve as Lead Plaintiffs and representative parties on behalf of the two classes described in the complaint, including providing testimony at deposition and trial, if necessary.  The Funds fully understand the duties and responsibilities of a Lead Plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the classes.

6.    The Funds' transactions in Chembio securities between April 1, 2020 and June 16, 2020 (inclusive) are set forth in the two charts attached hereto.  Fund III directly purchased 77,859 shares in Chembio's public offering on May 7, 2020 at $11.75 per share.  Cayman Fund directly purchased 25,883 shares in that offering on the same date and at the same price.  PE Fund also directly purchased 21,258 shares in that offering on the same date and at the same price.  The remaining

transactions listed in the two charts consist of transactions by the Funds with respect to Chembio common stock on the open market.

7.    The Funds have not sought to serve as a Lead Plaintiff or representative party on behalf of a class in any action under the federal securities laws filed during the three-year period preceding the date of this Certification.

8.    The Funds will not accept any payment for serving as a representative party on behalf of the classes beyond their pro rata shares of any recovery, except such reasonable costs and expenses directly relating to the representation of the classes, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 17 day of August, 2020 at New York, New York.

_____

David Greenhouse

*Special Situations Fund III QP, L.P.,*
*Special Situations Cayman Fund, L.P.*, *Special Situations*

### The Special Situations Funds' Trading

Re: 10b/20a Claims

| | | | | | |
|---|---|---|---|---|---|
| Total SSF Funds Share Purchases During Class Period: | | 128,000 | | Loss To 6/17/20 | |
| Total Cost of Shares Purchased During Class Period: | $ | 1,495,570.00 | | Closing Price | |
| Value After Disclosure (Using $3.89 Closing Price) | $ | 497,920.00 | | $ | 997,650.00 |
| Loss On 6/17/20 | $ | 769,140.00 | | | |

| | | | Holding | Cost of Purchase | Loss on 6/17/20: |
|---|---|---|---|---|---|
| Special Situations Cayman Fund, L.P. | 3/31/20 | 108,703 | Holding | Cost of Purchase | Loss on 6/17/20: |
| Special Situations Cayman Fund, L.P. | 4/1/20 | -25,882 | $ 7.24 | | |
| Special Situations Cayman Fund, L.P. | 4/1/20 | -15,529 | $ 7.12 | | |
| Special Situations Cayman Fund, L.P. | 4/6/20 | 207 | $ 5.95 | $ 1,231.65 | $ 426.42 |
| Special Situations Cayman Fund, L.P. | 4/13/20 | -5,176 | $ 9.08 | | |
| Special Situations Cayman Fund, L.P. | 4/13/20 | -207 | $ 9.08 | | |
| Special Situations Cayman Fund, L.P. | 4/13/20 | -15,528 | $ 9.66 | | |
| Special Situations Cayman Fund, L.P. | 4/16/20 | -2,070 | $ 11.37 | | |
| Special Situations Cayman Fund, L.P. | 4/16/20 | -18,635 | $ 12.23 | | |
| Special Situations Cayman Fund, L.P. | 4/28/20 | 207 | $ 10.50 | $ 2,173.50 | $ 1,250.28 |
| Special Situations Cayman Fund, L.P. | 5/7/20 | 25,883 | $ 11.75 | $ 304,125.25 | $ 156,333.32 |
| Special Situations Cayman Fund, L.P. | 5/21/20 | 207 | $ 10.37 | $ 2,146.59 | $ 1,250.28 |

| | | |
|---|---|---|
| Special Situations Cayman Fund, L.P. | Shares Purchased in Class Period: | 26,504 |
| | Cost of Shares: | $ 309,676.99 |
| | Value Post-Disclosure (Using $3.89 Closing Price): | $ 103,100.56 |
| | Loss on 6/17/20 | $ 159,260.30 |

| | | | Holding | Cost of Purchase | Loss on 6/16/20: |
|---|---|---|---|---|---|
| Special Situations Fund III QP, L.P. | 3/31/20 | 327,009 | Holding | Cost of Purchase | Loss on 6/16/20: |
| Special Situations Fund III QP, L.P. | 4/1/20 | -77,859 | $ 7.24 | | |
| Special Situations Fund III QP, L.P. | 4/1/20 | -46,716 | $ 7.12 | | |
| Special Situations Fund III QP, L.P. | 4/6/20 | 623 | $ 5.95 | $ 3,706.85 | $ 1,283.38 |
| Special Situations Fund III QP, L.P. | 4/13/20 | -15,572 | $ 9.08 | | |
| Special Situations Fund III QP, L.P. | 4/13/20 | -623 | $ 9.08 | | |
| Special Situations Fund III QP, L.P. | 4/13/20 | -46,716 | $ 9.66 | | |
| Special Situations Fund III QP, L.P. | 4/16/20 | -6,229 | $ 11.37 | | |
| Special Situations Fund III QP, L.P. | 4/16/20 | -56,058 | $ 12.23 | | |
| Special Situations Fund III QP, L.P. | 4/28/20 | 623 | $ 10.50 | $ 6,541.50 | $ 3,762.92 |
| Special Situations Fund III QP, L.P. | 5/7/20 | 77,859 | $ 11.75 | $ 914,843.25 | $ 470,268.36 |
| Special Situations Fund III QP, L.P. | 5/21/20 | 623 | $ 10.37 | $ 6,460.51 | $ 3,762.92 |

| | | |
|---|---|---|
| Special Situations Fund III QP, L.P. | Shares Purchased in Class Period: | 79,728 |
| | Cost of Shares: | $ 931,552.11 |
| | Value Post-Disclosure (Using $3.89 Closing Price): | $ 310,141.92 |
| | Loss on 6/17/20 | $ 479,077.58 |

| | | | Holding | Cost of Purchase | Loss on 6/16/20: |
|---|---|---|---|---|---|
| Special Situations Private Equity Fund, L.P. | 3/31/20 | 89,288 | Holding | Cost of Purchase | Loss on 6/16/20: |
| Special Situations Private Equity Fund, L.P. | 4/1/20 | -21,259 | $ 7.24 | | |
| Special Situations Private Equity Fund, L.P. | 4/1/20 | -12,755 | $ 7.12 | | |
| Special Situations Private Equity Fund, L.P. | 4/6/20 | 170 | $ 5.95 | $ 1,011.50 | $ 350.20 |
| Special Situations Private Equity Fund, L.P. | 4/13/20 | -4,252 | $ 9.08 | | |
| Special Situations Private Equity Fund, L.P. | 4/13/20 | -170 | $ 9.08 | | |
| Special Situations Private Equity Fund, L.P. | 4/13/20 | -12,756 | $ 9.66 | | |
| Special Situations Private Equity Fund, L.P. | 4/16/20 | -1,701 | $ 11.37 | | |
| Special Situations Private Equity Fund, L.P. | 4/16/20 | -15,307 | $ 12.23 | | |
| Special Situations Private Equity Fund, L.P. | 4/28/20 | 170 | $ 10.50 | $ 1,785.00 | $ 1,026.80 |
| Special Situations Private Equity Fund, L.P. | 5/7/20 | 21,258 | $ 11.75 | $ 249,781.50 | $ 128,398.32 |
| Special Situations Private Equity Fund, L.P. | 5/21/20 | 170 | $ 10.37 | $ 1,762.90 | $ 1,026.80 |

| | | |
|---|---|---|
| Special Situations Private Equity Fund, L.P. | Shares Purchased in Class Period: | 21,768 |
| | Cost of Shares: | $ 254,340.90 |
| | Value Post-Disclosure (Using $3.89 Closing Price): | $ 84,677.52 |
| | Loss on 6/17/20 | $ 130,802.12 |

### The Special Situations Funds' Trading

Re: Section 11/15/12a Claims

| | |
|---|---|
| Total SSF Funds Share Purchased In Offering | 125,000 |
| Total Cost of Shares Purchased In Offering: | $ 1,468,750.00 |
| Value After Disclosure (6/17/20 Closing Price) | $ 486,250.00 |
| Value As of Date of First Lawsuit | $ 470,000.00 |

| | Valuation Date | |
|---|---|---|
| | 6/17/2020 | 6/18/2020 |
| Total | | |
| Loss on Offering Shares | $ 982,500.00 | $ 998,750.00 |

| | Trade Date | Qnty. | Price | Cost of Purchase |
|---|---|---|---|---|
| Special Situations Cayman Fund, L.P. | 5/7/20 | 25,883 | $ 11.75 | $ 304,125.25 |
| Special Situations Cayman Fund, L.P. | 5/21/20 | 207 | $ 10.37 | |

| | Price | Extended | Loss on Offering Shares |
|---|---|---|---|
| Value of Offerring Shares as of Closing 6/17/20 | $ 3.89 | $ 100,684.87 | $203,440.38 |
| Value of Offerring Shares as of Closing 6/18/20 | $ 3.76 | $ 97,320.08 | $206,805.17 |

| | Trade Date | Qnty. | Price | Cost of Purchase |
|---|---|---|---|---|
| Special Situations Fund III QP, L.P. | 5/7/20 | 77,859 | $ 11.75 | $ 914,843.25 |
| Special Situations Fund III QP, L.P. | 5/21/20 | 623 | $ 10.37 | |

| | Price | Extended | Loss on Offering Shares |
|---|---|---|---|
| Value of Offerring Shares as of Closing 6/17/20 | $ 3.89 | $ 302,871.51 | $611,971.74 |
| Value of Offerring Shares as of Closing 6/18/20 | $ 3.76 | $ 292,749.84 | $622,093.41 |

| | Trade Date | Qnty. | Price | Cost of Purchase |
|---|---|---|---|---|
| Special Situations Private Equity Fund, L.P. | 5/7/20 | 21,258 | $ 11.75 | $ 249,781.50 |
| Special Situations Private Equity Fund, L.P. | 5/21/20 | 170 | $ 10.37 | |

| | Price | Extended | Loss on Offering Shares |
|---|---|---|---|
| Value of Offerring Shares as of Closing 6/17/20 | $ 3.89 | $ 82,693.62 | $167,087.88 |
| Value of Offerring Shares as of Closing 6/18/20 | $ 3.76 | $ 79,930.08 | $169,851.42 |